UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x

EXTENET SYSTEMS, INC.

                               Plaintiff,                     **COMPLAINT**

                    -against-

                                                         DOCKET NO. 1:18-cv-258 (GTS/DJS)

THE CITY OF ALBANY and THE DEPARTMENT OF
GENERAL SERVICES OF THE CITY OF ALBANY,

                               Defendants.

----------------------------------------------------------------------------x

        Plaintiff ExteNet Systems, Inc. ("Plaintiff" or "ExteNet"), by its attorneys Cuddy & Feder LLP, as and for its Complaint against Defendant The City of Albany ("Albany" or the "City") and Defendant The Department of General Services of the City of Albany ("DGS") (collectively, "Defendants"), respectfully alleges as follows:

Facts Common To All Counts

Nature Of The Action

        1.    This action arises from the City's denial of permits, without substantial evidence for the denial, and contrary to the authorization of the City of Albany Common Council ("Common Council") of the equipment and installation of "small cells" and related equipment in public rights of way in Albany ("PROW") as memorialized in a franchise agreement between ExteNet and the City.

        2.    ExteNet designs, installs and operates telecommunications facilities throughout the United States which are typically used by Federal Communications Commission ("FCC") licensed wireless carriers to provide wireless services to the public – services which make functional mobile devices, such as tablets, computers, and phones used for personal and business

purposes including E911 access.

3.      In the State of New York, ExteNet is a facilities-based telephone corporation that maintains a Certificate of Public Convenience and Necessity ("CPCN") issued by the New York State Public Service Commission ("NYS PSC") in 2005 pursuant to New York State laws and regulations.

4.      ExteNet's CPCN authorizes it to provide telecommunications services and deploy telecommunications facilities in public rights of way throughout the State of New York.

5.      Telecommunications facilities installed on existing or new utility poles, or on government owned traffic stanchions or street lights, in the public right of way for the provision of wireless services to the public are often referred to as "small cells" or distributed antenna systems ("DAS") by the telecommunications industry and FCC.

6.      A typical "small cell" or DAS "node" consists of an antenna and equipment cabinet (typically a few cubic feet in volume) mounted to a utility pole, traffic stanchion or street light with connections to electric and fiber optic lines.

7.      Each small cell or DAS node located on a pole can be used by one or more FCC licensed carriers to provide network wireless services to a discrete area which is limited in geographical scope due to the relatively low height and transmit power of each small cell or DAS node on a pole.

8.      Several small cells or DAS nodes can be deployed in a system to provide network wireless services to a larger geographic area in a municipality ("DAS System").

9.      ExteNet's deployment of small cells and DAS Systems for use in the provision of FCC licensed wireless services advances federal public policy "to make available so far as possible, to all people of the United States . . . a rapid, efficient, nationwide and worldwide

wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication."  47 U.S.C. § 151.

10.     In New York, ExteNet has wireless pole attachment agreements with all of the major investor-owned utility companies ("Electric Utility") that own electric distribution systems and poles, and incumbent local exchange carriers ("ILEC") that own the plain old telephone system ("POTS") and poles, which agreements have been entered into in furtherance of federal and state laws and allow ExteNet to install equipment, fixtures and lines used in DAS Systems on utility poles in the PROW.  47 U.S.C. § 224; N.Y. Pub. Serv. Law § 119-a.

11.     Over the past decade, ExteNet has installed thousands of small cells and DAS nodes on Electric Utility or ILEC owned utility poles in numerous communities in the State of New York, and complied with each municipality's specific legal requirements for access to the PROW and obtained any permits that may have been needed in each such jurisdiction for small cells or DAS nodes installed as part of DAS Systems.

12.     Over the past decade, ExteNet has also installed thousands of small cells and DAS nodes on municipally owned structures in several communities in the State of New York pursuant to negotiated franchise agreements entered into by municipalities and ExteNet that allow siting on municipal owned structures for use and installation of small cells or DAS nodes in DAS Systems.

13.     In 2015, a FCC licensed wireless carrier requested that ExteNet develop a DAS System in the City of Albany for the carrier's use in the provision of personal wireless services to the public ("Carrier Customer").

14.     ExteNet's Carrier Customer requested the initial installation and operation

3

of several DAS nodes in an area of Albany generally referred to by the parties as Buckingham Lake (the "DAS Project").

15.     In December 2015, ExteNet and its Carrier Customer entered into a contract for the specific DAS Project and in furtherance of ExteNet's approved tariff on file with the NYS PSC ("Customer License Agreement").

16.     The DAS Project as initially designed and engineered by ExteNet and its Carrier Customer specified the attachment of DAS nodes on predominantly existing structures in the PROW including Electric Utility and ILEC owned utility poles.

17.     The DAS Project as initially designed and engineered also identified a few City owned traffic stanchions or street lights where attachments of a small cell or DAS node was technically preferred and might avoid new ExteNet utility pole installations in the PROW.

18.     In the capitol region of New York, ExteNet has wireless pole attachment agreements with National Grid, the Electric Utility and Verizon, and the ILEC, which authorize ExteNet's installation of small cells or DAS nodes on utility poles for use in its DAS Systems.

19.     Upon signing of the Customer License Agreement, ExteNet initiated the typical process of review and pole make-ready work by the Electric Utility and ILEC as required by its wireless pole attachment agreements with these local utilities.

20.     In early 2016 ExteNet contacted City officials to discuss any City legal requirements associated with: a) a CPCN telephone corporations' access to the PROW, b) permitting requirements, if any, for utility attachments or installation of new utility poles in the PROW, and c) to request a non-exclusive franchise agreement to allow ExteNet to attach small cells or DAS nodes on City owned structures in the PROW.

21.     Over a period of approximately one year: a) ExteNet engaged in good faith

negotiations with the City for a franchise agreement to use municipal structures; b) ExteNet provided a draft agreement which would also incorporate other terms and conditions associated with ExteNet's access to the PROW for installation of small cells or DAS nodes on utility poles throughout the City; c) ExteNet collaborated with City agencies on equipment specifications for DAS System equipment attached to City owned structures; and d) ExteNet obtained from the City its interpretations of the City Code and any municipal regulatory permitting requirements associated with ExteNet's attachments to existing or new utility poles in the PROW.

22.    During that same year and through March 31, 2017, the City, through DGS and other City officials working under the direction of the Mayor ("City Officials"): a) negotiated a franchise agreement with ExteNet for use of City owned structures in the PROW for use in DAS Systems; b) reviewed and approved other terms and conditions associated with ExteNet's access to the PROW for installation of small cells or DAS nodes on utility poles throughout the City; c) reviewed and approved specifications for DAS System equipment attached to City owned structures and other installations as part of the ExteNet DAS Project; and d) rendered determinations and legal interpretations of the City Code that, among other matters, determined that ExteNet small cell or DAS node attachments to existing utility poles in the PROW did not require certain City permits.

23.    On March 31, 2017, the City stated that it would no longer consider any negotiated non-exclusive franchise agreements for small cells or DAS nodes, and was contemplating issuing a much broader "broadband RFI" in the future.

24.    On April 11, 2017, ExteNet advised City Officials that it was planning to proceed with the DAS Project as modified and reengineered to eliminate the proposed installation of small cells or DAS nodes on City of Albany owned traffic stations or street lights in the PROW.

25.     During the period of May 5, 2017 through January 2018, ExteNet submitted applications and permit filings with the City, DGS and Office of the Mayor in accordance with the City's legislated PROW access and permitting requirements and consistent with prior determinations and discussions with City Officials ("DAS Permit Applications").

26.     On December 21, 2017 the City Council adopted resolutions expressly consenting to ExteNet's access to the PROW and authorizing the execution of a Telecommunications Attachment and Rights-of-Way Agreement, which was fully executed by the City and ExteNet on January 11, 2018 (the "Agreement").

27.     Notwithstanding the City's approval and Agreement authorizing the equipment included in the DAS Project Applications, without substantial evidence and exceeding its authority under City Codes and as specified in the Agreement, DGS arbitrarily and capriciously denied ExteNet's permit applications for 7 new pole sets on January 30, 2018, and denied the permit applications for 28 existing poles on February 8, 2018 (the "Denials").

28.     The Denials, as more fully set forth herein, thwart federal policy and violate federal laws, including *inter alia*, various sections of the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Telecommunications Act," the "Communications Act," the "Act" or the "TCA"), 47 U.S.C. §§ 332(c)(7)(B) and 253(a)(c), by unreasonably discriminating against ExteNet as compared to other utility providers allowed to use the PROW for their telecommunications services, by effectively prohibiting ExteNet's provision of telecommunications services from equipment in the PROW, and by denying ExteNet's request to install its DAS network without substantial evidence to support such Denials.

29.     The Denials, as more fully set forth herein, breach the PROW Agreement between the City and ExteNet.

6

30.     DGS exceeded its authority in issuing the Denials, as more fully set forth herein, and its actions were in excess of the municipal jurisdiction to manage, on reasonable terms and conditions, ExteNet's access to the PROW, and violated the Communications Act.

31.     The Denials also violate New York State laws, and the City's municipal code provisions adopted in furtherance thereof, which set forth the legal requirements in Albany for telephone corporations to access the PROW, including any associated municipal permitting requirements, including *inter alia*, Section 27 of the New York State Transportation Corporations Law ("NY TCL") and Chapters 171 and 375 of the City Code of the City of Albany ("City Code").

32.     ExteNet seeks relief under Federal law, New York State law, the City Code and the Agreement, including: a) a reversal of the Denials; b) a declaration that the Denials violate Section 332(c)(7) of the Communications Act; c) a declaration that ExteNet has complied with all City legal requirements associated with the installation of it's DAS System in the PROW; d) and a permanent injunction preventing the City from interfering with ExteNet's pole attachment contracts with utility companies and mandating issuance of the DAS Permit Applications.

33.     ExteNet respectfully asks this Court to prioritize the disposition of this case in accordance with Section 332(c)(7)(B)(v) of the Communications Act, which directs that "the court shall hear and decide" such claims "on an expedited basis."

<u>The Parties</u>

34.     Plaintiff ExteNet is a corporation organized under the laws of the State of Delaware, with a principal address at 3030 Warrenville Road, Lisle, Illinois 60532.

35.     Plaintiff ExteNet (through its predecessor in interest) has been granted a CPCN, Case No. 05-C-1428 (December 2, 2005), by the NYS PSC in order to offer its

telecommunications services in the State of New York.

36.     Plaintiff ExteNet constructs and deploys facilities for the provision of telecommunications services and/or personal wireless services to the public as those terms are used and defined in Sections 253 and 332 of the Communications Act.

37.      Defendant City is a municipal corporation of the State of New York, with an office located at City Hall, 24 Eagle Street, Albany, New York 12207.

38.     Defendant DGS is a municipal agency responsible for overseeing the management of City owned rights-of-way and authorized to issue permits for utility pole installations in City owned rights-of-way as delegated to it by the Common Council of the City of Albany pursuant to Chapter 171, Article IV of the City Code entitled "*Utility Pole Regulations*" and Chapter 375 of the City Code entitled *"Unified Sustainable Development."*

39.     Defendant DGS maintains an office located at One Richard J. Conners Boulevard, Albany, New York 12204.  Plaintiff seeks jurisdiction over Defendant DGS in its official capacity and only to the extent otherwise required for injunctive relief to be granted to the Plaintiff to the fullest extent and as sought in this action.

Jurisdiction And Venue

40.     This Court has subject matter jurisdiction over this action pursuant to: (a) Sections 253(a), (c) and 332(c)(7)(B) of the Communications Act, because ExteNet has been adversely affected and aggrieved by Defendants' actions in violation of these provisions of the Communications Act; and (b) 28 USC § 1331 because this is a civil action that presents federal questions arising under the Communications Act.

41.     This Court has personal jurisdiction over Defendants, a municipal corporation and municipal agency, because they reside in this District, and venue is proper in this

Court.

42.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims stated herein arose in the judicial district for the United States District Court, Northern District of New York, and Defendants reside in this District.

The Important Federal Interests At Issue In This Case<br>And ExteNet's Provision Of Services In Furtherance Thereof

43.     Congress has declared there is a public need for wireless communication services such as "personal wireless services," as set forth in the Communications Act, and the FCC rules, regulations and orders promulgated pursuant thereto.

44.     Congress intended the Communications Act as amended to "provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies to all Americans." H.R. Rep. No. 104-458, at 206 (1996) (Conf. Rep.); *see also* 1996 U.S. Code Cong. and Adm. News, p. 10.

45.     Section 253(a) of the Communications Act prohibits state and municipal governments from erecting barriers that prohibit or have the effect of prohibiting the ability of any entity to provide telecommunications services.

46.     In regulating the provision of wireless services to the public, the FCC licenses providers of wireless services to use limited resources, frequencies and spectrum allocated by the FCC for the provision of such services to the public.

47.     While the Communications Act generally preserves state and local authority over the placement, construction or modification of telecommunications infrastructure and/or wireless facilities, it expressly preempts any state or local government action which effectively prohibits or unreasonably discriminates in the provision of any telecommunications and/or

9

wireless services, as set forth in Sections 253(a) and 332(c)(7)(B) of the Act.

48.     Section 253(c) of the Communications Act further limits state and municipal jurisdiction regulating access to public rights of way for telecommunications services to municipal "management" of access to public rights of way, and further requires that any state and municipal actions must be made on a competitively neutral and non-discriminatory basis.

49.     In furtherance of national policy to expedite the provision of wireless services to the public, the FCC has regulated specific timeframes within which state and local governments must act on wireless facility requests or permit applications.

50.     The FCC recognized: "personal wireless service providers have often faced lengthy and unreasonable delays in the consideration of their facility siting applications, and that the persistence of such delays is impeding the deployment of advanced and emergency services." *Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, Declaratory Ruling, 24 FCC Rcd. 13994 ¶ 32 (Nov. 18, 2009) ("Shot Clock Order").

51.     The Shot Clock Order states that a "reasonable period of time" for municipal decision making on requests or permit applications for wireless facilities is presumptively 90 days for collocations on existing structures and 150 days for all other applications.

52.     If a state or local government does not act upon requests/permit applications within those timeframes, then a 'failure to act' has occurred and personal wireless service providers may seek redress in a court of competent jurisdiction . . . " pursuant to federal law, including the Shot Clock Order.

53.     ExteNet provides "telecommunications service" as that term is defined by the Communications Act, 47 U.S.C. § 153(53).

54.     ExteNet's telecommunications service typically consists of transporting ExteNet's customers' communications (voice and data) over fiber optic lines between points designated by the customer without altering the content of the communications, and converting the communications from optical to radiofrequencies that are transmitted from equipment and an antenna at each small cell or DAS node in a DAS System.

55.     ExteNet's typical telecommunications service offering involves a communication signal handed off from ExteNet's customer, which ExteNet then transports over fiber optic facilities and the actual small cells or DAS nodes that are located on utility poles, streetlights or other structures in the PROW.

56.     Small cell or DAS nodes in ExteNet's networks typically include a small, low-power antenna, amplifiers that converts radiofrequency ("RF") signals to optical signals (and vice versa, *i.e.*, from optical to RF) contained in a metal cabinet, coaxial and fiber optic lines, and associated equipment, all mounted to a pole in the PROW.

57.     ExteNet's DAS Systems are licensed and typically used by ExteNet's customers to provide personal wireless services to the public, and can also be used in public safety communications systems or for other services using FCC unlicensed spectrum.

58.     ExteNet's Carrier Customer and other potential customers in Albany are typically retail providers of wireless telecommunications services (also known as Commercial Mobile Radio Services), including the wireless carrier customer under contract with ExteNet and seeking to expand its wireless services to the public in Albany through the ExteNet DAS Project.

59.     ExteNet's small cells and DAS nodes constitute "personal wireless service

facilities" as defined in Section 332(c)(7) of the Communications Act.

60.     ExteNet's proposed service in the City of Albany is a facilities-based telephone service and telecommunications service as authorized by its NYS PSC issued CPCN.

<u>State and City Laws Regulating and Permitting ExteNet's Access to the PROW in Albany</u>

61.     As a telephone corporation holding a CPCN issued by the NYS PSC, ExteNet also has rights independent of federal law, pursuant to Section 27 of the New York State Transportation Corporations Law, to deploy its infrastructure in public rights of way on reasonable terms and conditions for such access by municipalities.

62.     The City of Albany has expressly legislated the terms and conditions by which telephone corporations may access the PROW in Albany, which are set forth in City Code Chapter 171, Article I entitled "*Telegraph, Telephone, Electric Lights, Railways and Power Lines*."

63.     The City of Albany requires permits for the installation of new utility poles in the PROW pursuant to City Code Chapter 171, Article IV entitled "*Utility Pole Regulations.*"

64.     There are no specific City Code requirements for permits for the equipment installed on existing utility poles in the PROW, and the City previously stated that no City permits were required for any such ExteNet installations in the City.

65.     For attachments of utility equipment to any City of Albany owned structures in the PROW, including but not limited to municipally owned traffic stanchions or street lights, the City has determined that Chapter 82 of the City Code requires a franchise agreement approved by the Common Council of the City of Albany – an approval which ExteNet has obtained.

<u>ExteNet's PROW Access Request & Its Franchise Negotiations with the City</u>

66.     In early 2016, ExteNet contacted City of Albany officials to discuss any of its legal requirements (access conditions and/or permitting) for small cells and DAS Systems in

the PROW, and also to request a non-exclusive franchise agreement for attachments to City owned structures in the PROW.

67.     In furtherance of its discussions with City officials, in March of 2016 ExteNet submitted to the City a draft contract that would both: a) memorialize voluntary terms and conditions associated with ExteNet's access to the PROW for small cell and DAS installations on new or existing utility poles in accordance with federal and State laws; and also b) include a non-exclusive franchise agreement with the City for any ExteNet's wireless attachments to municipally owned street signs, traffic lights and/or other municipally owned structures in the PROW.

68.     ExteNet was directed by City Officials to work with the City Law Department on its review of the proposed PROW contract and any negotiations of the franchise component, prior to presentation of the agreement to the Common Council for its review and approval pursuant to Chapter 82 of the City Code.

69.     ExteNet was also directed by City Officials to work with DGS for review of ExteNet's equipment specifications, plans and permits for the DAS Project.

70.     Over the course of the next several months, ExteNet met with the City Law Department and DGS numerous times to review the proposed DAS System in Albany including components not regulated by the City, noting to City Officials ExteNet's desire to commence and complete the DAS Project by year-end 2016.

71.     As part of its meetings with the City Law Department and DGS, ExteNet made several revisions to components of the DAS Project to address any and all engineering, ROW safety, aesthetic and/or other comments it received from City Officials.

72.     By the late Fall of 2016, it was clear that the City's review and approval of the PROW Contract and any required permits for portions of the DAS Project could not be issued by year-end.

73.     ExteNet elected to continue working with City Officials on a non-exclusive

franchise agreement.

74.     In early 2017, DGS and the City Law Department completed their respective reviews of the DAS Project and a proposed PROW contract.

75.     In February 2017, the proposed PROW contract was referred to the Common Council for its review and approval pursuant to Chapter 82 of the City Code.

76.     On March 31, 2017, on the eve of a City Common Council meeting at which ExteNet's fully negotiated franchise agreement included in the proposed PROW contract was to be reviewed and considered, the Chief of Staff for the Mayor of the City of Albany wrote to ExteNet stating that the City had been conducting a comprehensive broadband study for 14 months and was now planning to issue a request for interest to various service providers on potential opportunities to partner with the City at some later date.

77.     The Chief of Staff's March 31, 2017 correspondence to ExteNet also stated: "[t]he City …. will no longer consider requests to facilitate the installation of individual small cell units in the City right of way outside of the RFI proposals."

78.     ExteNet representatives expressed their concerns to City Officials on the decision to not make City owned infrastructure in the PROW available for small cell use, given the year of negotiations and design work undertaken by ExteNet with the City in good faith, reiterated its interest in working with the City further at such time as the City was ready to proceed with considering use of its proprietary structures for small cell installations, and otherwise noted the company's intent to now proceed with the DAS Project using only Electric Utility, ILEC and ExteNet owned utility poles in  the PROW.

79.     ExteNet reengineered and redesigned the DAS Project to eliminate the proposed use of any and all City of Albany owned structures in the PROW.

80.     On April 11, 2017, counsel for ExteNet advised the City in writing that the

company intended to move forward with those aspects of the DAS Project that did not require a

City of Albany franchise agreement, that several ExteNet planned attachments to NGRID Electric

Utility poles were anticipated for installation in May of 2017 (noting the City previously stated

there were no specific City Code permit requirements for utility pole attachments) and that permit

applications for new ExteNet owned telephone poles as required under Chapter 171 of the City

Code would be filed with the City shortly.

   81. On May 4, 2017, ExteNet filed seven applications with DGS for installation

of new ExteNet-owned telephone poles in the PROW pursuant to the requirements of Chapter 171,

Section 1781-57.A of the City Code (the "New Telephone Pole Applications").

   82. ExteNet representatives and counsel thereafter followed up with DGS and

the City Law Department verbally and in writing to discuss processing of the New Telephone Pole

Applications.

   83. On May 12, 2017, counsel for ExteNet sent the City correspondence

advising the City of certain procedural requirements under federal law, including the Shot Clock

Order, and the City's legal obligation to timely process permit applications for wireless facilities

including small cells or DAS nodes included in the New Telephone Pole Applications.

   84. Having received no substantive communications from the City in response

to the outreach and letters, counsel for ExteNet corresponded with DGS and the City Law

Department on June 5, 2017, advising the City that the New Telephone Pole Applications had been

deemed complete by operation of federal law and that a decision on the applications would be

required within 150 days of the original filing date, *i.e.*, by October 5, 2017.

   85. Shortly after June 5, 2017, ExteNet representatives traveled to DGS to meet

with the agency to go over the substance of the New Telephone Pole Applications, at which time

the Assistant Director of Operations, an individual who had been part of the year's prior discussions with ExteNet about the DAS Project, advised ExteNet's representatives verbally that the City was not going to process the applications because ExteNet had no "agreement" on file with the City and would not otherwise discuss the substance of the DAS Project further with ExteNet.

86.     City Code Chapter 171, Article I, Section 171-2 states that "[n]o telegraph, telephone or electric line shall hereafter be erected or maintained until the owner thereof shall file with the Mayor a written agreement accepting and promising to abide by and perform all the conditions and provisions of this article, and all amendments hereafter made thereto."

87.     Sections 171-3 through 171-14 of Article I of Chapter 171 set forth legislated "conditions" associated with access to the PROW for telephone company installations on utility poles in Albany ("City Conditions").

88.     Upon information and belief, there was no specific form of "agreement" or filing required by the City of Albany associated with Section 171-2 of the City Code and the City Conditions.

89.     On June 27, 2017, the Executive Vice President and CFO of ExteNet executed an "Agreement of ExteNet Systems, Inc. Pursuant to Albany City Code Chapter 171, Article I," which also included voluntary provisions related to PROW access that had been part of ExteNet's discussions on the proposed PROW contract and typical of other municipal legal requirements, notwithstanding the City Code's lack of such additional legal requirements (the "ExteNet Voluntary Conditions").

90.     On July 7, 2017, counsel for ExteNet formally filed the company's executed and written agreement with the Mayor's office that accepted and promised to be bound by the City

16

Conditions set forth in Article I of Chapter 171 of the City Code and also the ExteNet Voluntary Conditions associated with its access to the PROW for installations on utility poles not owned by the City.

91.     By mid-July 2017, the Electric Utility and ILEC had notified ExteNet that the companies had completed their "make-ready" work on the several utility poles ExteNet planned for installation of a small cell or DAS node in Albany, work completed at ExteNet's cost and expense as specified in its separate wireless pole attachment agreements with NGRID and Verizon.

92.     In July 19, 2017 correspondence from counsel to ExteNet to DGS, the City was notified that ExteNet had filed a copy of its agreement to abide by the City Conditions on July 7, 2017, that construction by ExteNet of wireless attachments on existing NGRID and Verizon poles would commence shortly, and requested again a meeting to discuss the pending New Telephone Pole Applications.

93.     Construction of ExteNet's small cells or DAS nodes on NGRID utility poles was scheduled to commence on Monday August 7, 2017 in compliance with City Conditions and those additional requirements in ExteNet's pole attachment agreements with NGRID and Verizon.

94.     On August 3, 2017, ExteNet representatives were notified by NGRID representatives that the Assistant Director of Operations for DGS contacted NGRID representatives and stated in electronic correspondence that: "Gary Bohls from the Town (sic) of Albany [called] stating that Albany was not allowing for Extent (sic.) Systems to install equipment on any poles in the Town (sic.) of Albany??"

95.     On August 3, 2017, and as a direct response to DGS communications to it, NGRID put "holds" on all of ExteNet's construction or design work with NGRID in the City of

Albany, and the construction of pole attachments scheduled for August 7, 2017 was canceled.

96.     ExteNet and the City thereafter engaged in settlement discussions and the parties entered into an administrative tolling agreement given the federal requirements for action on permit applications within at most 150 days of filing (the "Tolling Agreement").

97.     On September 19, 2017, ExteNet, without prejudice and despite the City's prior positions, filed applications with the City Building Department for 28 equipment installations at *existing* utility pole locations for purposes of review under Section 375-5.E of the City Code (the "Existing Pole Applications").

98.     DGS then requested ExteNet to file applications for street and sidewalk opening permits under Chapter 171 of the City Code, as well as applications for building permits and electrical permits, for the Existing Pole Applications.

99.     On September 26, 2017, without prejudice and despite the City's prior positions, counsel for ExteNet provided DGS with ExteNet's Street and Sidewalk Opening Permit Application Form for the Existing Pole Applications, and requested an interpretation of City Code Chapter 171 that DGS permits were not required for attachments, such as ExteNet's, which had no physical construction at grade and which otherwise met NESC and NGRID/Verizon attachment requirements as overseen by the NYS PSC and/or the City Building Department.

100.     As of October 26, 2017, the Existing Pole Applications were deemed complete under the Shot Clock Order as a matter of federal law.

101.     On November 2, 2017 and November 16, 2017, the City and ExteNet entered into an amended Tolling Agreement extending the time for the City to consider ExteNet's Agreement and make a decision on the New Telephone Pole Applications and Existing Pole Applications until January 2, 2018, which without formal revision of the Tolling Agreement

18

ExteNet later agreed to extend until <u>January 15, 2018</u>.

102.   On December 21, 2017, the Common Council issued a unanimous Resolution determining that ExteNet's installations of antenna and equipment on existing infrastructure in the PROW were Type II exempt from SEQRA and/or that the installation of new utility infrastructure would have "no significant environmental impact," thereby adopting a negative declaration under SEQRA (the "Negative Declaration").

103.   Also on December 21, 2017, the Common Council voted *unanimously* to authorize the City's execution of a rights-of-way franchise agreement with ExteNet for ExteNet to install its telecommunications equipment in the PROW (the "Consent Resolution").

104.   The Common Council's resolution also granted ExteNet a non-exclusive franchise for installations on City owned structures in the PROW in furtherance of Chapter 82 of the City Code.

105.   Pursuant to the Consent Resolution, the parties entered into the Telecommunications Attachment and Rights-of-Way Agreement, which was fully executed on January 11, 2018 (the "Agreement").

The Agreement

106.   The parties' Agreement expressly recognizes that federal law precludes discrimination by local governments in "the regulation of the placement, construction, and modification of personal wireless service facilities."

107.   The parties' Agreement also explicitly recognizes that local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

108.   Section 2.1 of the Agreement authorizes ExteNet to access the PROW "to attach, install, operate, maintain, remove, reattach, reinstall, relocate, and replace Equipment in or

on Utility Infrastructure or other structures lawfully owned and operated by public utility companies".

109.     Section 2.1 of the Agreement also provides that the City will not deny an application to access the PROW "based upon the size, quantity, shape, color, weight, configuration, or other physical properties" of the equipment, so long as the equipment confirms to pre-approved equipment configurations and specifications set forth in Exhibit A to the Agreement.

110.     Section 2.2 of the Agreement further provides that the City will approve ExteNet's applications to attach equipment and/or install new poles in the PROW once the City "verifies that the Equipment proposed in the design complies with the pre-approved configurations and the Equipment specifications set forth in Exhibit A."

111.     All of ExteNet's permit applications filed with the City and DGS are for equipment and poles that fully conform to the pre-approved configurations and Equipment specifications set forth in Exhibit A to the Agreement.

112.     Section 5.3 of the Agreement, titled "Permits," provides that *if* building, excavation or encroachment permits are required, the City will "cooperate in expediting the issuance of such permits as reasonably requested by ExteNet in order to meet the reasonable requirements of ExteNet's customers and the telecommunications services needs of end users served by them."

<u>The Permit Denials</u>

113.     ExteNet's permit applications should have been approved under the Consent Resolution, as well as pursuant to the express terms of the Agreement, Federal and State law and City Code permit standards no later than January 15, 2018, the date to which the Tolling

Agreement was verbally extended.

114.    The Tolling Agreement expired no later than January 15, 2018.

115.    DGS subsequently informed ExteNet that it would require a separate Chapter 171 street and sidewalks permit application form for each of the Existing Pole Applications.

116.    In light of the now executed Agreement with the City, ExteNet complied with DGS' procedural request, resubmitting single application forms for each of the 28 existing pole locations to DGS on January 23, 2018.

117.    On January 30, 2018, DGS denied the New Telephone Pole Applications, with no substantial evidence to support the denials, and no jurisdictional authority to issue the denials, particularly in light of the City's Agreement and City Code standards.

118.    On February 8, 2018, DGS provided ExteNet with "Review Notes" on the Existing Pole Applications, with comments and requests for additional information to be filed in new permit applications with the City.

119.    The February 8, 2018 Review Notes from DGS do not contain substantial evidence that would support the permit denials, and several statements that are legal pre-conditions to approval of any subsequent permit applications are in excess of DGS' jurisdictional authority, particularly in light of the City's Agreement and City Code standards.

120.    The February 8, 2018 DGS Review Notes contain numerous unreasonable legal requirements to consideration of any re-submitted permit applications that are discriminatory and unlawful.

121.    The Denials were arbitrary and capricious, and/or part of ongoing delays by City agencies for reasons not disclosed to ExteNet by DGS and City agencies.

122.    The Denials violated the City's Consent Resolution and the parties' Agreement.

123.    The Denials violated Sections 253 and 332 of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, by discriminating against ExteNet as compared to other providers in the PROW, effectively prohibiting ExteNet's provision of telecommunications services from equipment in the PROW, and by exceeding the scope of the City's municipal jurisdiction to manage, on reasonable terms and conditions, ExteNet's access to the PROW.

124.    The Denials violated ExteNet's rights as a CPCN holder, and Section 27 of the New York State Transportation Corporations Law which allows ExteNet to access the PROW to install its equipment.

125.    The Denials arbitrarily, capriciously, and unlawfully imposed conditions for permit approvals beyond those authorized or required by Chapters 171 and 375 of the City Codes for the City of Albany.

126.    The Denials and new conditions set forth in the Review Notes were unlawfully and improperly issued well after the Shot Clock had expired on January 15, 2018.

127.    For all of these reasons, the Denials unlawfully and wrongfully prohibit ExteNet from installing equipment in the PROW, necessitating the relief sought in this action as more fully described in the following Counts.

## COUNT I
### (Substantial Evidence)
### (For Violation of 47 U.S.C. § 332(c)(7)(B)(iii))

128.    ExteNet incorporates herein by reference all prior allegations set forth herein.

129.    Section 332(c)(7)(B)(iii) of the Communications Act, as amended by Section 704, provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

130.    In violation of this Section, the Denials eschew the actual factual evidence in the record and rest instead on conditions and requirements having no bearing on any legitimate scope of municipal review, which review should have been limited solely to the level of review employed for other similarly-situated utility infrastructure providers who install poles and/or utility equipment in the right of way.

131.    ExteNet's applications for permits satisfied all legitimate review requirements, and the City had no grounds upon which to deny the permits sought by ExteNet in accordance with its contractual rights and rights under State, Federal and City laws.

132.    The substantial evidence in the record did not support the Denials, and instead established ExteNet's entitlement to the permits, and the Denials were thus in violation of Section 332(c)(7)(B)(iii) of the Communications Act.

133.    ExteNet is thus entitled to an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's requests and applications and issue any and all City permits and authorizations for ExteNet to immediately begin the necessary work to deploy and operate its infrastructure in the rights of way, and allow for ExteNet's customers to take whatever actions are necessary to provide wireless services through ExteNet's infrastructure network.

**COUNT II**
**(For Effective Prohibition and Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II))**

134.    ExteNet incorporates herein by reference all prior allegations set forth herein.

135.    Section 332(c)(7)(B)(i)(II) of the Communications Act provides that the "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

136.    The FCC's regulations, orders and rulings have determined that small cells and/or DAS nodes constructed by companies like ExteNet are personal wireless services facilities for purposes of Section 332(c)(7)(B) of the Communications Act.

137.    The City's Denials effectively prohibit ExteNet from installing personal wireless services facilities as part of the DAS Project proposed for wireless services to the public, including for residents, businesses and travelers locally in Albany.

138.    ExteNet is thus entitled to an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's requests and applications and issue all required City permits and authorizations for ExteNet to immediately begin the necessary work to deploy and operate its infrastructure in the rights of way, and allow for ExteNet's customers to take whatever actions are necessary to provide wireless services through ExteNet's infrastructure network.

<u>**COUNT III**</u>
**(For Prohibition of Services, Bar to Entry, Discrimination
and Exceeding Municipal Jurisdiction in Violation of 47 U.S.C. § 253)**

139.    ExteNet incorporates herein by reference all prior allegations set forth herein.

140.    47 U.S.C. § 253(a) provides that "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

141.    ExteNet has been attempting to exercise its right to access the public rights of way located within the City to provide telecommunications services since it first contacted the City in 2016.

142.    The City has unlawfully exceeded its jurisdiction and is prohibiting ExteNet from providing its telecommunications services to its customers in the City.

143.    The City has interfered with ExteNet's contracts with other companies, including but not limited to the Electric Utility NGRID.

144.    ExteNet's DAS Project has been subjected to substantial, unreasonable, and unjustified delays and increased costs as a result of the City's actions and Denials.

145.    The City is obstructing, preventing and barring entry to the deployment of ExteNet's telecommunications facilities in the PROW, while other similarly-situated utility providers in the rights of way have not been subjected to the review procedures, delays and Denials imposed on ExteNet, and have been able to mount their utility infrastructure on poles in the right of way with limited, and on information and belief, at times no permits or reviews required by the City.

146.    The City's actions and Denials in response to ExteNet's attempts to gain

access to the PROW and provide telecommunications services creates an unreasonable ongoing delay and discriminatory treatment against ExteNet as compared to other utility providers in the PROW, has barred entry of ExteNet and construction of its equipment in the PROW, and has the effect of prohibiting the ability of ExteNet to provide telecommunications services in the City in violation of 47 U.S.C. § 253(a).

147.   The City's actions and Denials in response to ExteNet's attempts to exercise its right to access the PROW and provide telecommunications services over the course of over a year and a half, and the City's effective prohibition of its proposed DAS Project, exceed the City's management authority, are not competitively neutral and nondiscriminatory, and are not related to the City's imposition of fair, reasonable and lawful requirements, and are, therefore, not within the limited authority reserved to the City under 47 U.S.C. § 253(c).

148.   ExteNet has suffered and will continue to suffer irreparable harm as a result of the City's unreasonable tactics in denying ExteNet's efforts to deploy its infrastructure, and the City's effectively prohibiting ExteNet from providing telecommunications services and barring its entry to the PROW in Albany.

149.   ExteNet is thus entitled to an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's requests and applications and issue all required permits and authorizations for ExteNet to immediately begin the necessary work to deploy and operate its infrastructure in the rights of way, and allow for ExteNet's customers to take whatever actions are necessary to provide wireless services through ExteNet's infrastructure network.

**COUNT IV**
**(For Violation of New York State Transportation**
**Corporations Law § 27 and City Code Chapter 171)**

150.    ExteNet incorporates herein by reference all prior allegations set forth herein.

151.    ExteNet's CPCN and related provisions of the New York State Transportation Corporations Law § 27 grant it a statewide franchise so that it "may erect, construct and maintain the necessary fixtures for its lines upon, over or under any of the public roads, streets and highways and may erect, construct and maintain its necessary stations, plants, equipment or lines upon, through or over any other land" subject to any required "consents" by municipalities.

152.    The Common Council of the City of Albany legislated the City's consent for telephone corporations to access the PROW in Albany, subject to the City Conditions specifically enumerated, listed and contained in Chapter 171 of the City Code and/or specifically granted ExteNet consent as part of its resolutions issued pursuant to Chapter 82 of the City Code.

153.    The City's Denials are in excess of the City's jurisdiction as reserved to it by Section 27 of the New York State Transportation Corporations Law, and exceed any lawful requirements legislated by the Common Council of the City of Albany, including but not limited to those included in the Agreement and City Codes.

154.    Defendants have violated ExteNet's rights under the New York State Transportation Corporations Law and its CPCN issued by the New York State Public Service Commission.

155.    ExteNet is thus entitled to an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's requests and applications and issue all required permits and authorizations for ExteNet to immediately begin the necessary work to deploy

and operate its infrastructure in the rights of way, and allow for ExteNet's customers to take whatever actions are necessary to provide wireless services through ExteNet's infrastructure network.

## COUNT V
### (For Breach of Contract)

156.    ExteNet incorporates herein by reference all prior allegations set forth herein.

157.    ExteNet has a valid, existing contract with the City, as evidenced by the Agreement.

158.    The Agreement specifies the extent to which the City has the right to review any request for ExteNet to install pre-approved Equipment on utility poles within the City's rights of way.

159.    The City breached the Agreement by imposing on ExteNet review requirements beyond those permissible by the Agreement, and City Codes incorporated by express reference therein, and by denying ExteNet's requests for permits in violation of ExteNet's rights under the Agreement.

160.    As a direct and proximate result of the City's breach of its contract, ExteNet has been damaged by virtue of the City preventing ExteNet from deploying its infrastructure in the rights of way, and the City has thus deprived ExteNet of the benefit of its bargain with respect to the Agreement.

161.    As a remedy for the City's breach of its contract, ExteNet is entitled to damages in an amount to be determined at trial, including but not limited to ExteNet's lost profits and consequential damages, an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's requests and issue all necessary permits and authorizations for

ExteNet to immediately begin the necessary work to deploy and operate its infrastructure in the rights of way and allow for ExteNet's customers to take whatever actions are necessary to provide wireless services through ExteNet's infrastructure network.

**COUNT VI**
**(For Breach of the Implied Covenant of Good Faith and Fair Dealing)**

162.    ExteNet incorporates herein by reference all prior allegations set forth herein.

163.    ExteNet has a valid, existing contract with the City as evidenced by the Agreement.

164.    Implied in the Agreement is the covenant of good faith and fair dealing that New York law recognizes is inherent in all contracts, and such covenant, among other things, prohibits a party to a contract from acting in a manner that would subvert the primary purpose of, and deprive the other party of the fruits of, the bargained for exchange which is the subject of the contract.

165.    The City breached the implied covenant of good faith and fair dealing by attempting to impose onerous requirements on ExteNet, and delay and deny ExteNet's lawful deployment of equipment in the PROW, stripping ExteNet of any meaningful benefit under the Agreement.

166.    As a direct and proximate result of the City's breach of the implied covenant of good faith and fair dealing, ExteNet has been damaged by virtue of the City making ExteNet unable to deploy its infrastructure in the rights of way based on onerous requirements intended to deprive ExteNet of the benefit of its bargain with respect to the Agreement.

167.    As a remedy for the City's breach of the implied covenant of good faith and fair dealing, ExteNet is entitled to damages in an amount to be determined at trial, including but

not limited to ExteNet's lost profits and consequential damages, an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's requests and issue all necessary permits and authorizations for ExteNet to immediately begin the necessary work to deploy its infrastructure in the rights of way.

**COUNT VII**
**(For Reversal Of The Denials**
**Pursuant To Article 78 Of New York CPLR)**

168.    ExteNet incorporates herein by reference all prior allegations set forth herein.

169.    The evidence in the record required approval of ExteNet's Applications to deploy its infrastructure in the PROW and thereby provide wireless services in accordance with federal policy.

170.    ExteNet's Applications complied with all applicable requirements.

171.    The City's Denials were not based on substantial evidence in the record or even on whether ExteNet had complied with the applicable City Code review standards that are applied to other utility providers in the rights of way.

172.    The City's Denials of the Applications were in error of law, arbitrary and capricious and in violation of New York State law, warranting reversal pursuant to Article 78 of the New York CPLR.

173.    ExteNet is thus entitled to an order and judgment reversing the Denials and mandating that the City immediately grant ExteNet's request for all required permits and authorizations for ExteNet to immediately begin the necessary work to deploy and operate its infrastructure in the rights of way and allow for ExteNet's customers to take whatever actions are necessary to provide wireless services through ExteNet's infrastructure network.

WHEREFORE, ExteNet respectfully demands judgment of this Court on the Counts set forth above as follows:

1.     On all Counts, an order and judgment reversing the Denials and granting approval of all permit applications;

2.     On all Counts, an order and judgment declaring that ExteNet has complied with all City legal requirements for attachment of its small cells or DAS nodes to Electric Utility and/or ILEC utility poles in the PROW in Albany and/or installation of new utility poles and may install such small cells and/or DAS nodes and equipment used in its DAS Systems;

3.     On all Counts, an order and judgment enjoining the City and City Officials from interfering with ExteNet's wireless pole attachment agreements with NGRID and Verizon;

4.     On all Counts, ExteNet's costs, expenses, and attorneys' fees, and any and all other damages and interest to which ExteNet is lawfully entitled, together with such other and further relief as the Court deems just and proper.

Dated: White Plains, New York
          February 28, 2018

                                        **CUDDY & FEDER LLP**
                                        Attorneys for Plaintiff
                                        445 Hamilton Avenue, 14th Floor
                                        White Plains, New York 10601
                                        (914) 761-1300


                        By:     _____
                                        Andrew P. Schriever (AS 9788)

Of Counsel:
Christopher B. Fisher
(Admission Application Pending)